**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 14, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

AECOM TECHNICAL SERVICES,
INC.,

      Plaintiff / Counter defendant -
Appellee,

v.                                                                            No. 25-1140

FLATIRON | AECOM, LLC,

      Defendant / Counterclaimant -
Appellant.
_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:19-CV-02811-WJM-KAS)**
_____

Michael C. Davis of Venable LLP, Washington, District of Columbia (David L.
Feinberg of Venable LLP, Washington, District of Columbia, and Mitchell Y.
Mirviss of Venable LLP, Baltimore, Maryland, with him on the briefs), for
Defendant/Counterclaimant-Appellant.

Bennett L. Cohen of Polsinelli PC, Denver, Colorado (Stephen D. Gurr and M.
Adam Lewis with him on the brief), for Plaintiff/Counter defendant-Appellee.
_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

A joint venture between two infrastructure firms bid for a contract to construct express lanes on Denver's C-470 freeway. Using designs created by an engineering subcontractor, the joint venture won the bid, and the joint venture agreed to continue working with the subcontractor on the project. But relations between the joint venture and the subcontractor soured, with each alleging sloppiness or bad faith in the other's performance. Eventually they sued each other in federal district court. After a seventeen-day trial, a jury returned a verdict for the subcontractor on all claims and counterclaims, and the court entered judgment accordingly.

The joint venture now asks us to review a litany of rulings made during nearly five years of litigation. It argues that errors in those rulings warrant a new trial. Some of its arguments are procedural, others are substantive, but all lack merit. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's judgment for the subcontractor.

## BACKGROUND

### I.     Factual Background

In 2015, the Colorado Department of Transportation solicited bids for constructing express lanes on a 12.5-mile stretch of State Highway 470 (also known as C-470) south of Denver. Flatiron Constructors, Inc. and AECOM Energy & Construction, Inc. formed a joint venture to bid for the project. The joint venture hired AECOM's engineering arm, AECOM Technical Services, Inc. (ATS), to design the roadways and other structures for the eventual bid.

Proper design work was critical for accurately estimating the project's cost. So at the pre-award stage, the joint venture and ATS entered into a formal teaming agreement. The teaming agreement required ATS's designs to be "consistent with all professional engineering principles generally accepted as standards of the industry in [Colorado]." App. vol. VIII at 2267. It also required the designs to meet "the standard of care, skill and diligence commensurate with that provided by other design professionals at the [pre-award] stage for projects of similar size, type and complexity," and to meet "any additional standards set forth" by the CDOT. *Id.* If the joint venture and ATS were shortlisted for the project, the teaming agreement required them "to negotiate in good faith" a subcontract for post-award designs. *Id.* at 2266.

Using ATS's designs, the joint venture won the CDOT contract, and the parties entered into a post-award subcontract. The subcontract incorporated all the teaming agreement's terms "not inconsistent with" the subcontract's own. App. vol. IX at 2354. The subcontract also "supersede[d] all prior . . . agreements" and "represent[ed] the [parties'] entire agreement" going forward. *Id.*

Under the subcontract's terms, the joint venture would pay ATS a lump sum of about $9 million for post-award designs.[1] The subcontract also capped ATS's potential liability to the joint venture at roughly $10 million—"100% of

---

[1] ATS was paid around $730,000 for its pre-award designs.

3

the Lump Sum in the aggregate, less direct costs, plus additional design fees incurred" for the post-award work. App. vol. VIII at 2283, 2287. The teaming agreement hadn't capped ATS's liability.

Over the next few years, redesigns and delays plagued the project. The parties blame each other. The joint venture says it discovered that ATS's pre-award work was shoddy and noncompliant with the CDOT's standards. In contrast, ATS says the joint venture cut corners and crafted its low bid by asking ATS for just a fraction of the designs the project needed.

During the construction period, ATS submitted at least twenty-seven "potential change orders" to the joint venture. Each potential change order proposed a design change and stated the value of the work that went into it.

The subcontract required all proposed changes to be "outside the work scope described herein." *Id.* at 2342. And before a change order could be submitted to the CDOT, the subcontract required the order to be approved by the parties' Design Change Control Board. Each party bore responsibility for staffing the board, which had three members—one from the joint venture, one from ATS, and one third-party neutral selected by the parties.

Before the Control Board was formed, the joint venture submitted one of ATS's potential change orders to the CDOT without board approval. Though the CDOT paid the joint venture for some of the work that went into the proposed change, the joint venture didn't share that money with ATS.

Later, after the board was formed, the joint venture "effectively shelved" several of ATS's potential change orders without submitting them to the board. App. vol. VII at 1999–2000. It did so because litigation had begun and the joint venture "assum[ed] that [the change orders] would get resolved" in court. *Id.* at 2000.

## II.    Procedural History

### A.    Claims & Counterclaims

In 2019, ATS sued the joint venture in the District of Colorado, alleging breach of the subcontract and, alternatively, unjust enrichment.[2] ATS sought over $5 million in damages, mostly for uncompensated potential change orders.

The joint venture countersued for breach of the subcontract and breach of the teaming agreement. It later added a tort counterclaim for negligent misrepresentation during the subcontract negotiations. In total, the joint venture sought over $260 million in damages from delays, increased materials, and other project changes.

### B.    ATS's Motion to Dismiss

ATS moved to dismiss the joint venture's counterclaims. It argued that because the negligent-misrepresentation counterclaim relied on contractual duties imposed by the teaming agreement, the counterclaim was barred by

---

[2] Under Colorado law, "breach of contract and unjust enrichment claims involving the same subject matter are mutually exclusive." *Bd. of Gov'rs v. Alderman*, 563 P.3d 1205, 1213 (Colo. 2025).

Colorado's economic-loss rule.[3] It also argued that because the subcontract superseded the teaming agreement, any counterclaim based on ATS's pre-award work must be brought as a counterclaim for breach of the subcontract.

The district court agreed that ATS's duties in negotiating the subcontract were defined by the teaming agreement, not by tort law. *AECOM Tech. Servs. v. Flatiron | AECOM, LLC* (*MTD Order*), No. 19-cv-2811, 2021 WL 698665, at *4 (D. Colo. Feb. 23, 2021). So the court dismissed the joint venture's negligent-misrepresentation counterclaim as barred by the economic-loss rule. *Id.* at *4, *6. But the court declined to dismiss the joint venture's counterclaim for breach of the teaming agreement, ruling that ATS's argument depended on facts outside the pleadings. *See id.* at *5.

## C.    ATS's Motion for Summary Judgment

Later, ATS moved for summary judgment on the joint venture's counterclaim for breach of the teaming agreement. It again argued that because the subcontract superseded the teaming agreement, any counterclaim based on ATS's pre-award work must be brought as a counterclaim for breach of the subcontract, which capped ATS's liability at roughly $10 million.

The district court agreed. *AECOM Tech. Servs. v. Flatiron | AECOM, LLC* (*MSJ Order*), No. 19-cv-2811, 2023 WL 5758860, at *6, *12 (D. Colo.

---

[3] The economic-loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr.*, 10 P.3d 1256, 1264 (Colo. 2000).

June 16, 2023). The court ruled that under "the plain language of the Teaming Agreement and the Subcontract," the joint venture "lost its right to sue [ATS] for breach of the Teaming Agreement." *Id.* at *6, *11. In other words, any counterclaim based on ATS's pre-award work could be brought only as part of the counterclaim for breach of the subcontract. *Id.* at *7. So the court granted summary judgment for ATS on the joint venture's counterclaim for breach of the teaming agreement, and it declared that the joint venture's counterclaim for breach of the subcontract was "subject to" the subcontract's liability limit. *Id.* at *6, *12.

D.    **The Joint Venture's Motion to Add Two Fraud Counterclaims**

About a month later, in July 2023, the joint venture sought to add counterclaims for fraudulent concealment and fraudulent inducement. But its request was untimely, because over three years had passed since the scheduling order's deadline for amending the pleadings, and over one year had passed since the district court entered its final pretrial order. The joint venture offered three reasons why its untimeliness should be excused.

First, the joint venture argued that discovery had unearthed facts "establishing ATS's intentional misrepresentations and omissions" during the pre-award period. App. vol. II at 408. The joint venture claimed to have discovered those facts in March 2022 while deposing ATS's lead drainage engineer. The joint venture said it then "rightfully" waited sixteen months to add the fraud counterclaims "[b]ecause fraud must be alleged with

particularity" and "ATS's concealments meant that the full story was not readily apparent until after post-discovery cohesion." *Id.* at 412.

Second, the joint venture identified what it called "a relevant change in the law." *Id.* at 400. It argued that while dismissing the negligent-misrepresentation counterclaim, the court had declared that the economic-loss rule applied to both unintentional and intentional torts. So in the joint venture's view, it "would have been futile" to try to add counterclaims for fraud. *Id.* at 413. But later the joint venture realized that "just weeks" *before* the court's dismissal order, a case called *McWhinney* had "call[ed] . . . into question" whether the economic-loss rule applied to intentional torts. *See id.* (citing *McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Ctrs.-Centerra LLC*, 486 P.3d 439, 453 (Colo. App. 2021)). The joint venture informed the court that this "development[]" made the court's economic-loss declaration "legally unsupportable," justifying the joint venture's belated effort to add the fraud counterclaims. *Id.* at 413–14.

Third, the joint venture argued that the court's summary-judgment order had recently "eliminated" the joint venture's right to sue ATS for "wrongful conduct during negotiation of the Subcontract." *Id.* at 411–12. The joint venture said that "upon this new development," it "acted diligently" in seeking to add two new claims about ATS's pre-award conduct. *Id.* at 412.

The district court refused to allow the joint venture to add the fraud counterclaims, reasoning that the joint venture had not shown the "manifest

8

injustice" required for modifying pretrial orders under Federal Rule of Civil Procedure 16(e). *AECOM Tech. Servs. v. Flatiron | AECOM, LLC* (*Modification Order*), No. 19-cv-2811, 2023 WL 5748376, at *1–4 (D. Colo. Sept. 6, 2023).

To start, the court "simply [did] not buy" that "the full story" of ATS's alleged fraud "was 'not readily apparent'" for sixteen months after discovering the relevant facts. *Id.* at *2. And because ATS had "spent the last four years preparing to try a five-week breach of contract case," the court ruled that ATS would suffer "overwhelming prejudice . . . if [the joint venture] were permitted to allege fraud claims at this point in the litigation." *Id.* at *3 (citation omitted). The court also declared that "[b]y bringing the Motion to Amend now, it is clear that [the joint venture] seeks to avoid the Court's application of the Subcontract's liability cap and fee-shifting provision." *Id.* Though the court "d[id] not wish to explicitly characterize [the motion] as brought in 'bad faith,'" it described the motion's timing as "certainly suspect." *Id.*

The court also rejected the joint venture's argument about a change in Colorado law. It noted that *Bermel v. BlueRadios, Inc.*, 440 P.3d 1150 (Colo. 2019), the case *McWhinney* relied on, was decided "a year before [the joint venture] filed its counterclaims." *Modification Order*, 2023 WL 5748376, at *4. The court observed that even though the joint venture "could have pled accordingly . . . at the onset of this litigation," it "chose not to do so." *Id.* The court also ruled that "regardless of any purported change in the law, . . . the

9

prejudice to [ATS] in allowing [the joint venture] to add fraud claims at this juncture of the litigation is too overwhelming for the Court to countenance." *Id.*

Finally, the court rejected the joint venture's argument that the court's summary-judgment order had "eliminated" any right to sue about ATS's pre-award designs. *Id.* As the court had already "thoroughly explained," any counterclaim about ATS's pre-award work "remains cognizable as a claim for breach of the Subcontract." *Id.*

## E. The Joint Venture's Motion for Judgment Against Itself on ATS's Breach-of-Contract Claim

A month and a half before trial, the joint venture informed the court that during settlement negotiations, the joint venture "propose[d] to stipulate to the merits of ATS's affirmative contract claim." App. vol. VI at 1744. The joint venture's proposal had two conditions: (1) that "the contract amount stipulated by the parties . . . be subject to setoff after the jury verdict" on the joint venture's breach-of-contract counterclaim, and (2) that the joint venture "assume the status of plaintiff for all purposes at trial." *Id.* The joint venture said ATS "ha[d] not substantively responded to this proposal." *Id.* at 1744–45. The joint venture also told the court that if the parties couldn't agree, the joint venture would "seek guidance from the Court, because [it] does not intend to contest at trial the breach of contract claim by ATS . . . subject to [the joint venture's] right of setoff and ability to proceed as plaintiff." *Id.* at 1745.

10

The parties did not agree, so ten days before trial, the joint venture moved for judgment against itself in the full amount of ATS's breach-of-contract claim. The joint venture asked the court to "permit the [joint venture] to assume the role of plaintiff for all purposes at trial" and to "exclude from the trial any evidence or argument about ATS's claims." App. vol. VII at 1828. According to the joint venture, the parties had "reach[ed] a stipulated judgment on these issues" but "ATS's counsel backed out just hours before the [joint venture] intended to file." *Id.* at 1832–33. The joint venture also accused ATS of "wast[ing] days of jury time by presenting its affirmative claim—a claim to which the [joint venture] plans to present no defense in part so [it] can use the available trial time for what it believes are more important issues." *Id.* at 1833.

ATS responded that if the joint venture's offer hadn't come "with strings attached," ATS would have accepted the offer two months earlier, when doing so "would have substantially reduced ATS's trial preparation burden." *Id.* at 1839–40. But with only a few days left before trial, ATS said it would no longer accept even an unconditional offer, given "how a last-minute change in the parties' roles as plaintiff and defendant would upend [the parties'] preparations." *Id.* at 1840–41.

The district court denied the joint venture's motion. Though the court agreed "that in practical terms it borders on the absurd to try [ATS's] claim[] under these circumstances," it saw "no justifiable reason that [the joint venture] waited until days before trial to request . . . relief." *Id.* at 1858. Besides, the

court said, ATS was "no longer interested in a confessed judgment." *Id.* In the court's view, there was "no legal or factual justification for . . . impos[ing], by means of a judicial order, what amounts to a settlement offer by [the joint venture] on [ATS] without the latter's consent." *Id.*

### F.    The Joint Venture's Motions for Judgment as a Matter of Law

As the plaintiff, ATS proceeded first at trial and used five days to make its affirmative case. ATS introduced evidence that of its $5.2 million in claimed damages, about $4.7 million was for twenty-seven potential change orders that ATS submitted to the joint venture but that the joint venture never paid.[4]

Once ATS rested its case, the joint venture moved for judgment as a matter of law under Rule 50(a). The joint venture argued that ATS hadn't introduced sufficient evidence (1) that any of the twenty-seven unpaid change orders had been approved by the Design Change Control Board or (2) that fourteen of those orders had proposed changes outside the subcontract's work scope. In other words, the joint venture argued that ATS had failed to meet two conditions for activating the joint venture's duty to pay under the subcontract's change-order provision. The district court did not immediately rule, instead "tak[ing] the . . . motion under advisement." App. vol. XIII at 3719.

On the sixteenth trial day, after evidence closed, the joint venture renewed its motion under Rule 50(b). The district court deferred ruling on that

---

[4] The rest of the claimed damages, roughly $543,000, were for the unpaid balance on the subcontract's lump-sum payment for ATS's post-award work.

12

motion, too, and submitted the case to the jury. After deliberating for half a day, the jury returned a verdict for ATS on ATS's and the joint venture's breach-of-contract claims.

The district court later denied the joint venture's Rule 50(b) motion. *AECOM Tech. Servs. v. Flatiron | AECOM, LLC* (*Rule 50 Order*), No. 19-cv-2811, 2024 WL 1330075, at *1, *4 (D. Colo. Mar. 28, 2024). First, the court ruled that the joint venture waived its right to enforce the two conditions precedent. *Id.* at *3–4. The court noted that the joint venture had submitted a change order to the CDOT "at least six months before the [Control Board] was formed," had received partial payment for that order, and had withheld part of that payment from ATS. *Id.* at *3. The court also quoted testimony that the joint venture had "shelved consideration of ATS's [change orders] in favor of letting [them] get resolved through litigation." *Id.* at *4 (citation modified).

Second, the court ruled that the jury reasonably found that the proposed changes were outside the subcontract's work scope. *Id.* Even if "some [change orders] did not provide such an explanation," the court reasoned, the jury still had a "legally sufficient evidentiary basis" for its verdict. *Id.* (citation omitted). The court cited the above testimony, plus "the totality of the evidence in this 18-day trial, including without limitation the parties' course of conduct in preparing [change orders] and submitting them for payment." *Id.*

13

## G.    The Joint Venture's Proposed Jury Instruction

Meanwhile, a month and a half before trial, the joint venture proposed a jury instruction on the implied duty of good faith and fair dealing in connection with the joint venture's breach-of-contract counterclaim. Later, at the final instructions conference, the joint venture argued that "[t]he implied duty is found in every contract under Colorado law" and that the trial evidence supported a finding that ATS had breached that duty. App. vol. XXI at 6077.

The district court refused to instruct the jury about the implied duty. In the court's view, "a claim for a breach of the implied [duty] of good faith and fair dealing is a separate claim, which . . . had to have been preserved in [the] final pretrial order." *Id.* Yet the first time the court saw "any reference" to that duty "was in the submission of the jury instructions," over a year after the pretrial order. *Id.* at 6078. So even though the court agreed that Colorado law implies a duty of good faith and fair dealing into every contract, it ruled that the joint venture "never asserted" a claim based on that duty and thus hadn't preserved one for trial. *Id.*

## H.    Judgment & Appeal

Consistent with the jury's verdict, the district court awarded ATS $5.259 million in compensatory damages, plus pre- and post-judgment interest. After months of litigation over fees and costs, the joint venture timely appealed.

14

**DISCUSSION**

The joint venture argues that four of the district court's decisions were erroneous and warrant a new trial. First, it says the court should have granted its motion for judgment against itself on ATS's breach-of-contract claim. Second, it says the court should have granted its Rule 50(b) motion for judgment as a matter of law. Third, it says the court should have instructed the jury about the implied duty of good faith and fair dealing. And fourth, it says the court should have allowed it to add two fraud counterclaims.[5]

We reject these arguments, and we affirm the district court's judgment for ATS on ATS's and the joint venture's breach-of-contract claims.

**I.    Denial of the Joint Venture's Motion for Judgment Against Itself**

The joint venture asserts three errors in the district court's denial of its motion for judgment against itself. First, it argues that the court lacked jurisdiction to hear ATS's breach-of-contract claim, because the joint venture's offer of judgment in the claim's full amount rendered the claim constitutionally moot. Second, it argues that the court violated due process by allowing ATS's claim to go to trial. And third, it argues that even if the court had discretion to deny the joint venture's motion, the court abused that discretion by over-

---

[5] The joint venture also alleges two errors that wouldn't warrant a new trial but would affect a possible damages award at a new trial.

crediting the prejudice to ATS from switching the order of proof and by failing to recognize the joint venture's efforts in negotiating with ATS.

These arguments don't persuade us. We affirm the district court's denial of the joint venture's motion for judgment against itself on ATS's breach-of-contract claim.

## A.    Mootness

We review questions of justiciability, including mootness, de novo. *Shaw v. Smith*, 166 F.4th 61, 74 (10th Cir. 2026); *Brown v. Buhman*, 822 F.3d 1151, 1168 (10th Cir. 2016). We analyze mootness on a claim-by-claim basis. *Smith v. Becerra*, 44 F.4th 1238, 1247 (10th Cir. 2022).

Under Article III's case-or-controversy requirement, a claim becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted). In other words, a claim becomes constitutionally moot "if an event occurs . . . that makes it impossible for the court to grant any effectual relief whatever to a prevailing party." *Id.* (citation modified).

One event that moots a claim is the plaintiff's acceptance of a settlement offer or offer of judgment. *Tosco Corp. v. Hodel*, 804 F.2d 590, 592 (10th Cir. 1986); *Montgomery v. Kraft Foods Glob.*, 822 F.3d 304, 310 (6th Cir. 2016). The key word is "acceptance," because "an *unaccepted* settlement offer or offer of judgment does not moot a plaintiff's case." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165 (2016) (emphasis added); *see also* Fed. R. Civ. P. 68(b).

16

That's true no matter how good the offer's terms. *Campbell-Ewald*, 577 U.S. at 162.

For that reason, the joint venture's offer of judgment did not moot ATS's breach-of-contract claim. As the joint venture acknowledges, ATS never accepted its offer. And under *Campbell-Ewald*, what matters for constitutional mootness is an offer's acceptance, "however good" the offer was. *Id.* (citation omitted).

The joint venture tries to distinguish *Campbell-Ewald* by arguing that the defendant in that case didn't fully concede liability or ask the court to enter judgment like the joint venture did here. The joint venture analogizes itself to a hypothetical defendant that proactively "pay[s] the judgment amount into a court registry" payable to the plaintiff. *See* JV's Open. Br. at 39. In the joint venture's view, moving for judgment against itself is "tantamount to the same thing: a binding and complete acceptance of plaintiff's full recovery, subject to the court's control." *Id.*

This is unpersuasive. *Campbell-Ewald* refrained from deciding whether a claim becomes constitutionally moot "if a defendant deposits the full amount of the plaintiff's individual claim in an account payable to the plaintiff, and the court then enters judgment for the plaintiff in that amount." 577 U.S. at 166. And even if those actions could moot a plaintiff's claim, the joint venture's actions—offering judgment, then asking the court to enter that judgment once ATS rejected it—are not "tantamount to the same thing." JV's Open. Br. at 39.

17

So like *Campbell-Ewald*, we reserve the deposit-and-judgment question "for a case in which it is not hypothetical," and we reject the joint venture's argument because "an unaccepted settlement offer or offer of judgment does not moot a plaintiff's case." 577 U.S. at 165–66.

The joint venture next tries to cabin *Campbell-Ewald*'s holding to class actions. It cites several decisions and articles that purportedly confirm *Campbell-Ewald*'s class-action focus. It also quotes our decision in *Lucero v. Bureau of Collection Recovery*, 639 F.3d 1239 (10th Cir. 2011), which observed that

> [w]hile we have yet to address the question squarely, other circuits have concluded that if a defendant makes an offer of judgment in complete satisfaction of a plaintiff's claims *in a non-class action*, the plaintiff's claims are rendered moot because he lacks a remaining interest in the outcome of the case.

*Id.* at 1243. To the joint venture, these authorities confirm that offers of judgment have different mootness implications for individual claims than for class claims.

We reject these arguments. True enough, *Campbell-Ewald* concerned class actions—namely, whether a class-action defendant can moot a lawsuit by offering full judgment on the sole class representative's claims. *See* 577 U.S. at 156. But nothing in *Campbell-Ewald* limits its reasoning to that context. On the contrary, the Supreme Court declared that an unaccepted offer of judgment "ha[s] no continuing efficacy" "[u]nder basic principles of contract law." *Id.* at 163. Nor does *Campbell-Ewald*'s logic imply such a limit, given its focus on

18

one plaintiff's refusal to accept a settlement and judgment offered only to him. *See id.* at 157–58, 162–63. Finally, the joint venture's cited sources don't say or suggest that *Campbell-Ewald* is limited to class actions.

*Lucero* doesn't convince us otherwise. *Lucero* did not decide whether an individual-action defendant moots a plaintiff's claims by offering full judgment on them. *See* 639 F.3d at 1243. *Lucero* merely noted that other circuits had decided that it does.[6] *Id. Lucero* then distinguished that issue from the one presented—whether offers of judgment can moot class claims before class certification. *Id.* So *Lucero* is consistent with *Campbell-Ewald*'s later declaration that "an unaccepted settlement offer or offer of judgment does not moot a plaintiff's case." 577 U.S. at 165.

## B.    Due Process

We review de novo whether a district court's procedures violated due process. *FTC v. Kuykendall*, 312 F.3d 1329, 1333 (10th Cir. 2002), *vacated on other grounds*, 371 F.3d 745, 767–68 (10th Cir. 2004); *see High Lonesome Ranch, LLC v. Bd. of Cnty. Comm'rs*, 61 F.4th 1225, 1242 (10th Cir. 2023).

"Unless [a] claim is frivolous, a party is entitled to assert it, and to whatever judicial time is required to try it." *Del Rio v. N. Blower Co.*, 574 F.2d

---

[6] One of those circuits later overruled its holding. *Chapman v. First Index, Inc.*, 796 F.3d 783, 787 (7th Cir. 2015), *overruling Rand v. Monsanto Co.*, 926 F.2d 596, 598 (7th Cir. 1991). The other circuit later clarified that it never decided the mootness question for individual actions. *Compare Hooks v. Landmark Indus.*, 797 F.3d 309, 314 (5th Cir. 2015), *with Sandoz v. Cingular Wireless, LLC*, 553 F.3d 913, 921 (5th Cir. 2008).

23, 26 (1st Cir. 1978). Likewise, a party "ha[s] a right to refuse [a settlement] offer and to litigate to its heart's content." *United States ex rel. Wadeford Elec. Co. v. E.J. Biggs Constr. Co.*, 116 F.2d 768, 775 (7th Cir. 1940); *see also Bass v. Phx. Seadrill/78, Ltd.*, 749 F.2d 1154, 1164 (5th Cir. 1985). A court lacks power "to require [a] part[y] to accept a settlement to which [it] ha[s] not agreed." *See Evans v. Jeff D.*, 475 U.S. 717, 726 (1986).

The district court did not violate due process by trying ATS's breach-of-contract claim. No due-process right entitles a defendant to avoid trial on a plaintiff's legally supported claim. *See Bass*, 749 F.2d at 1164. If any due-process concerns were to arise here, it would be in the opposite situation—the court's forcing ATS to settle on the joint venture's terms. *See In re LaMarre*, 494 F.2d 753, 756 (6th Cir. 1974).

The joint venture argues that the court should have entered judgment on ATS's claim because it was "*effectively* moot," rendering a trial on that claim "fundamentally unfair" and "offending the deep-rooted demands of fair play enshrined in the Constitution." JV's Open. Br. at 41 (citation modified).

But the joint venture cites no authority for that point. Nor does it explain what it means for a claim to be "effectively moot." As discussed, ATS's claim isn't constitutionally moot. It also isn't prudentially moot, which applies only to claims for injunctive or declaratory relief. *Bacote v. Fed. Bureau of Prisons*, 119 F.4th 808, 813 n.2 (10th Cir. 2024). To the extent the joint venture argues that a claim is moot whenever the costs of trial outweigh the possible recovery,

20

that argument is mistaken. *See, e.g.*, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 282–83 (2021) (confirming the justiciability of suits for nominal damages). "If there is any chance of money changing hands," a claim "remains live." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 377 (2019).

The joint venture also refers to "the unfairness of according ATS the huge tactical benefit of nominal plaintiff status" and to the "charade" of ATS's "proceed[ing] both first and last as if it were a *bona fide* plaintiff." JV's Open. Br. at 33, 37.

Yet by rejecting the joint venture's offer of judgment, ATS ensured that its plaintiff status remained more than "nominal." Besides, a district court has discretion to decide who—plaintiff or counterclaimant—will proceed first at trial. *See Peterson v. Weinberger*, 508 F.2d 45, 54 (5th Cir. 1975); *Cont'l Baking Co. v. Old Homestead Bread Co.*, 476 F.2d 97, 101 (10th Cir. 1973). The parties proposed that ATS do so. We see no due-process problem in the court's blessing that proposal. And beyond calling the arrangement "unfair," the joint venture offers no argument to the contrary.[7] JV's Open. Br. at 41.

### C.    Abuse of Discretion

"A court abuses its discretion when its decision rests on an error of law or a clearly erroneous finding of fact, or when the decision manifests a clear

---

[7] The joint venture separately accuses ATS of "presenting its evidence in preemptive defense against the [joint venture's] counterclaim." JV's Open. Br. at 37. But what ATS did *at* trial has nothing to do with the joint venture's pretrial motion for judgment against itself.

error in judgment." *United States v. Kirby*, 161 F.4th 1208, 1213 (10th Cir. 2025) (citation modified). Put differently, a court abuses its discretion when it "exceed[s] the bounds of permissible choice, given the facts and the applicable law in the case at hand." *United States v. Clay*, 148 F.4th 1181, 1190 (10th Cir. 2025) (citation omitted).

The district court did not "exceed[] the bounds of permissible choice" in the circumstances. *Id.* On the contrary, it did the only thing it *could* do—reject the joint venture's attempt to effectively force a settlement on an unwilling party.[8] *See Evans*, 475 U.S. at 726; *Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985). A court doesn't abuse its discretion by making the only lawful choice under the circumstances. *See Clay*, 148 F.4th at 1190; *cf. United States ex rel. Doe v. Credit Suisse AG*, 117 F.4th 155, 161 (4th Cir. 2024). So we reject the joint venture's abuse-of-discretion argument.

## II.    Denial of the Joint Venture's Rule 50(b) Motion

We review de novo a district court's Rule 50(b) rulings. *Mtn. Dudes v. Split Rock Holdings*, 946 F.3d 1122, 1129 (10th Cir. 2019). Under Rule 50(b), entering judgment as a matter of law is appropriate only when the evidence points "one way" and supports "no reasonable inferences" for the nonmoving

---

[8] It's not clear under what authority the joint venture brought its motion. The joint venture says it sought relief under Rule 54(b). But Rule 54(b) merely permits a court to enter final judgment on a subset of decided claims or parties when "there is no just reason for delay." It doesn't authorize a court to decide claims or approve a settlement, much less force a settlement upon a party that rejects it. *See* Fed. R. Civ. P. 54(b).

party. *Id.* We draw all reasonable inferences in the nonmovant's favor, and we do not assess witness credibility or weigh the evidence. *Id.* at 1130.

The joint venture asserts two errors in the district court's denial of its Rule 50(b) motion. First, it argues that the court erred in concluding that by submitting ATS's first potential change order without Control Board approval, the joint venture waived the subcontract's Control Board condition. Second, it argues that for fourteen of the change orders, the court erred in ruling that ATS presented sufficient evidence that the proposed changes were outside the subcontract's work scope.

Neither argument persuades us. We affirm the district court's denial of the joint venture's Rule 50(b) motion for judgment as a matter of law.

A.    **Waiver of the Control Board Condition**

"Waiver is the intentional relinquishment of a known right or privilege." *Johnson v. People*, 524 P.3d 36, 41 (Colo. 2023) (citation modified). "Waiver may be explicit, such as when a party expressly abandons an existing right or privilege, or implied, such as when a party engages in conduct that manifests an intent to relinquish a right or privilege or acts inconsistently with its assertion." *Babcock v. People*, 569 P.3d 850, 856 (Colo. 2025) (citation modified). "For waiver to be implied by conduct, the conduct should be free from ambiguity and clearly manifest the intention not to assert the benefit." *Richmond v. Grabowski*, 781 P.2d 192, 195 (Colo. App. 1989).

23

Because intent is a fact issue, the question of whether a party waived a contractual provision—including a condition precedent—is usually a question for the factfinder. *See Avicanna Inc. v. Mewhinney*, 487 P.3d 1110, 1115 (Colo. App. 2019); *Vogel v. Carolina Int'l, Inc.*, 711 P.2d 708, 712 (Colo. App. 1985). So for the joint venture to prevail on its Rule 50(b) motion, it had to show that the evidence supported "no reasonable inferences" that the joint venture either (1) expressly waived the Control Board condition or (2) "clearly manifest[ed] the intention not to assert" that condition. *Mtn. Dudes*, 946 F.3d at 1129 (first quote); *Richmond*, 781 P.2d at 195 (second quote).

The joint venture did not meet this high standard. Undisputed testimony showed that the joint venture submitted ATS's first potential change order to the CDOT without Control Board approval. Undisputed testimony also showed that the joint venture later stopped sending change orders to the Control Board, instead "shelv[ing]" them to be sorted out in litigation. App. vol. VII at 1999–2000. From that testimony, the jury could reasonably conclude that the joint venture "clearly manifest[ed] the intention not to assert" the Control Board condition. *Richmond*, 781 P.2d at 195.

The joint venture counters that its failure to follow the Control Board condition in one instance "might have occurred for any reason" and "does not show requisite intent to waive [the condition] for all instances." JV's Open. Br. at 45–46. It also argues that its own "eventual halt of the [Control Board]

24

process . . . hardly constitutes an unequivocal waiver of the condition while the [Control Board] operated." *Id.* at 46 (internal quotation marks omitted).

But just because we might fathom a reason to think the joint venture's waiver *wasn't* unequivocal doesn't mean the jury couldn't reasonably find that it was. The evidence shows that the joint venture didn't always follow the requirement to submit change orders to the Control Board. From that, the jury could reasonably conclude that when the joint venture *did* follow the requirement, it did so out of prudence, not obligation. In other words, following the Control Board condition from time to time is compatible with a finding that the joint venture "clearly manifest[ed]" its intent not to assert that condition. *See Richmond*, 781 P.2d at 195.

The joint venture also argues that the subcontract "prohibits generalized claims of waiver." JV's Reply Br. at 25. In its view, the following provision required ATS to individually prove waiver for each unpaid change order:

> The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Subcontract, or to exercise any of its rights, shall not be construed as a waiver or relinquishment of any term, covenant, condition or right with respect to further performance.

App. vol. IX at 2353–54.

We don't consider this argument. The joint venture didn't identify that provision in either its initial or renewed Rule 50 motions. "And we generally do not consider new theories on appeal—even those that fall under the same general category as the one that was presented in the district court." *Timken v.*

*S. Denv. Cardiology Assocs.*, 155 F.4th 1227, 1239 (10th Cir. 2025) (citation

modified). The joint venture also didn't identify that provision in its opening

brief. And "[w]e do not consider late-blooming arguments raised for the first

time in a reply brief." *Alex W. v. Poudre Sch. Dist. R-1*, 94 F.4th 1176, 1186

(10th Cir. 2024) (citation modified).

> **B.      Sufficiency of the Evidence That All Proposed Changes Were Outside the Subcontract's Work Scope[9]**

At trial, ATS introduced into evidence a chart summarizing twenty-seven

potential change orders it submitted to the joint venture. For thirteen of those

orders, the chart described how the proposed change was outside the

subcontract's work scope. But for the other fourteen orders, the chart contained

no such description. The joint venture says this means the jury lacked sufficient

evidence to find that all twenty-seven proposed changes were outside the work

scope.

We disagree. ATS's project manager testified that the chart

"summariz[ed] . . . what th[e] out-of-scope work is." App. vol. XI at 3069. She

called one proposed change "another example" of problems that ATS did not

---

[9] The district court ruled that the joint venture's waiver of the Control Board condition "waived [the joint venture's] right to enforce Section 2.5 of the Subcontract." *Rule 50 Order*, 2024 WL 1330075, at *3. Because section 2.5 contains both the Control Board and the work-scope conditions, we read the court's order to rule that by waiving the Control Board condition, the joint venture also waived the work-scope condition. Yet neither party reads the order this way. We need not address the issue, because we conclude that ATS introduced sufficient evidence that the proposed changes were outside the subcontract's work scope.

and could not have predicted during the pre-award stage. *Id.* at 3070–71. And she noted the "additional work" that the proposed changes involved. *See, e.g.*, *id.* at 3069, 3073. Because the joint venture failed to rebut this evidence, the jury could reasonably infer that ATS met the work-scope condition.

### III.  Refusal to Give the Joint Venture's Proposed Instruction on the Implied Duty of Good Faith & Fair Dealing

The joint venture asserts two errors in the district court's refusal to give its proposed jury instruction on the implied duty of good faith and fair dealing in connection with its breach-of-contract counterclaim. First, it argues that by not including an instruction about the implied duty, the court misstated the law on breach of contract. Second, it argues that the court "erred in ruling that the [joint venture] failed to preserve the issue by not filing motions or pretrial statements raising an implied duty." JV's Open. Br. at 50.

Both arguments fail. We affirm the district court's refusal to instruct the jury on the implied duty of good faith and fair dealing.

### A.    Accurately Stating the Law

We review de novo whether jury instructions "accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *Packard v. City & Cnty. of Denv.*, 173 F.4th 1247, 1253 (10th Cir. 2026) (citation omitted).

"Every contract in Colorado contains an implied duty of good faith and fair dealing." *State Farm Mut. Auto. Ins. v. Goddard*, 484 P.3d 765, 772 (Colo.

App. 2021). A breach of that duty is a breach of contract. *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006). So under Colorado law, a plaintiff may—and often does—plead a breach-of-contract claim on an implied-duty theory. *See, e.g.*, *Genova v. Banner Health*, 896 F. Supp. 2d 993, 998 (D. Colo. 2012); *Denny Constr., Inc. v. City & Cnty. of Denv. ex rel. Bd. of Water Comm'rs*, 170 P.3d 733, 737 (Colo. App. 2007), *rev'd on other grounds*, 199 P.3d 742 (Colo. 2009).

But just because a breach-of-contract claim can rely on an implied-duty theory doesn't mean that all breach-of-contract claims *do* rely on that theory. The implied duty is enforceable only for contracts whose terms "allow[] for discretion." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). And even within such contracts, the implied duty isn't the sole possible basis for breach. *See, e.g.*, *McDonald v. Zions First Nat'l Bank, N.A.*, 348 P.3d 957, 965, 967 (Colo. App. 2015). As a result, many breach cases don't implicate the implied duty. *See, e.g.*, *Bertoia v. Galaxy Mgmt. Co.*, 574 P.3d 259, 268 (Colo. App. 2025); *Valdez v. Cantor*, 994 P.2d 483, 487 (Colo. App. 1999).

Given that, the district court did not misstate Colorado law by refusing to instruct about the implied duty in connection with the joint venture's breach-of-contract counterclaim. The implied duty is not "an inherent element" of breach. JV's Open. Br. at 50. On the contrary, its relevance and factual support vary by case. Sometimes, a court should *not* instruct about the implied duty, because instructing about irrelevant or unsupported theories risks confusing the jury.

28

*See, e.g., Zamora v. United States*, 369 F.2d 855, 859 (10th Cir. 1966). So even though some cases require an implied-duty instruction, the absence of such an instruction is not the per se legal error the joint venture says it is.[10]

## B.    Instructing on a Theory Not Identified in the Pretrial Order

The district court ruled that because the pretrial order didn't mention the implied duty, the joint venture hadn't preserved that theory and wasn't entitled to an instruction about it at trial. Put another way, the court refused to deviate from the pretrial order by instructing the jury on a theory the order did not contain. We review for abuse of discretion a court's decision whether to modify a pretrial order. *Monfore v. Phillips*, 778 F.3d 849, 851 (10th Cir. 2015).

A party is entitled to a proposed instruction that "is properly and timely brought to the trial court's attention, is legally correct, and is supported by the evidence." *First Sec. Bank of Beaver, Okla. v. Taylor*, 964 F.2d 1053, 1058 (10th Cir. 1992). A party may propose instructions "[a]t the close of the evidence or at any earlier reasonable time that the court orders." Fed. R. Civ. P. 51(a)(1). Once evidence has closed, a party may propose instructions "on issues that could not reasonably have been anticipated" by the earlier deadline, or on any other issue "with the court's permission." Fed. R. Civ. P. 51(a)(2).

---

[10] For the same reasons, we reject the joint venture's view that because the implied-duty instruction came from Colorado's pattern jury instructions, the district court had to give that instruction. Just because an instruction is in the pattern instructions doesn't mean it is appropriate for every case on that topic. *See Richards v. Att'ys' Title Guar. Fund*, 866 F.2d 1570, 1573 (10th Cir. 1989); *United States v. Edwards*, 782 F.3d 554, 564 (10th Cir. 2015).

At the same time, "any claims, issues, defenses, or theories of damages not included in the pretrial order are waived." *Murphy-Sims v. Owners Ins.*, 947 F.3d 628, 631 (10th Cir. 2020) (citation modified). A district court may modify its final pretrial order "only to prevent manifest injustice." Fed. R. Civ. P. 16(e). So even if a party timely proposes its jury instructions, a court may still refuse to instruct on "any issue that was foreseeable but not raised in a pretrial order or conference." *Potthast v. Metro-N. R.R. Co.*, 400 F.3d 143, 154 (2d Cir. 2005); *see also Century Refin. v. Hall*, 316 F.2d 15, 19 (10th Cir. 1963).

The district court did not abuse its discretion in refusing to instruct on the joint venture's implied-duty theory. The joint venture first proposed its implied-duty instruction six weeks before trial. Though that proposal met the court's initial deadline for proposing instructions, the underlying theory appeared in neither the proposed nor the final pretrial orders. The joint venture also never explains why it waited a year and a half after the final pretrial order—and over four years after its counterclaim—to raise that theory for the first time. Thus, we can't say that the joint venture "suffered manifest injustice, or anything approximating it," from the lack of an implied-duty instruction. *Potthast*, 400 F.3d at 157.

## IV.   Refusal to Allow the Joint Venture to Add Fraud Counterclaims

When the joint venture sought to add two fraud counterclaims, one year had passed since the district court had entered its final pretrial order. Again, we review for abuse of discretion a court's decision whether to modify a pretrial

30

order, *Monfore*, 778 F.3d at 851, which the court may do "only to prevent manifest injustice," Fed. R. Civ. P. 16(e).

The manifest-injustice inquiry considers (1) "prejudice or surprise" to the party opposing modification, (2) "the ability of that party to cure any prejudice," (3) "disruption to the orderly and efficient trial of the case," and (4) "bad faith by the party seeking to modify the order." *Koch v. Koch Indus.*, 203 F.3d 1202, 1222 (10th Cir. 2000). "[T]he burden of demonstrating manifest injustice falls upon the party moving for modification." *Id.*

The joint venture asserts two errors in the district court's refusal to modify the final pretrial order. First, it argues that the court wrongly concluded that the joint venture hadn't shown diligence or good faith in seeking the modification. Second, it argues that the court blindly accepted ATS's assertions of prejudice without examining whether the prejudice was curable.

We aren't persuaded. We affirm the district court's refusal to modify the pretrial order with the joint venture's two fraud counterclaims.

## A.    Diligence & Good Faith

The district court didn't abuse its discretion in concluding that the joint venture hadn't acted diligently or in good faith. A party's "failure to raise [a] specific [claim] at an earlier possible juncture cuts deeply against [its] claim of manifest injustice." *Id.* at 1223 (citation modified). Yet the joint venture waited to plead new counterclaims sixteen months after discovering ATS's alleged fraud. To explain the delay, the joint venture said that "the full story" of ATS's

31

fraud "was not readily apparent until after post-discovery cohesion." App. vol. II at 412. But this explanation "lacks credibility," because the joint venture had been trying to plead fraud "[f]rom the day [it] filed its Amended Counterclaim, in April 2020." *Modification Order*, 2023 WL 5748376, at *2 (first quote); App. vol. II at 410 (second quote). More likely, the joint venture "s[ought] to avoid the Court's application of the Subcontract's liability cap," the subject of a summary-judgment order issued one month earlier. *Modification Order*, 2023 WL 5748376, at *3; *see MSJ Order*, 2023 WL 5758860, at *6, *12.

The joint venture counters that the district court "too readily dismissed" its primary concern about the summary-judgment order. JV's Open. Br. at 53–54. The summary-judgment order's main ruling was that the subcontract subsumed the teaming agreement. *See MSJ Order*, 2023 WL 5758860, at *6, *11. The joint venture says it "feared" that this ruling "would prevent it from proving ATS's bad faith to the jury." JV's Open. Br. at 53. Thus, it tried to add fraud counterclaims to keep ATS's bad faith in play.

Any such fear was unfounded. The summary-judgment order made clear that claims about ATS's pre-award conduct didn't disappear but instead became claims "for breach of the liability-capped Subcontract." *MSJ Order*, 2023 WL 5758860, at *7. In other words, the joint venture could sue about ATS's pre-award conduct, including fraud during the subcontract negotiations, if it did so under the subcontract's $10 million liability limit. *See id.*

32

The joint venture also accuses the district court of "fail[ing] to credit the [joint venture's] need for caution" and "prudence" in pleading fraud. JV's Open. Br. at 54. Emphasizing that "[f]raud must be pled with particularity and proven by clear and convincing evidence," the joint venture cites two decisions that it says "accepted" tardy claims on the same justification. *Id.*

We disagree. Whatever care is needed in pleading fraud, *see generally* Fed. R. Civ. P. 9(b), the joint venture hasn't adequately explained why it took sixteen months to do so after discovering the relevant facts. Its explanation is even harder to believe given its eagerness to plead fraud from the outset. On top of that, neither of the decisions it cites applies the "manifest injustice" standard for modifying a final pretrial order. *See Riggs v. Johnson*, No. 09-cv-01226, 2010 WL 1957110, at *2–3 (D. Colo. Apr. 27, 2010); *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205–07 (10th Cir. 2006). Nor do those decisions approve anything close to a sixteenth-month period of "post-discovery cohesion." App. vol. II at 412; *see Riggs*, 2010 WL 1957110, at *2–3 (allowing new claims five weeks after new evidence); *Minter*, 451 F.3d at 1207 & n.7 (allowing a new claim six months after new evidence, partly because "[t]he record show[ed] that the plaintiff . . . believed [that his claim] was already fairly encompassed by his pleadings").

The joint venture further argues that "[w]hen litigation commenced, Colorado caselaw" on the economic-loss rule "was adverse" and "likely barred a fraud claim" over ATS's pre-award conduct. JV's Open. Br. at 54. In the joint

33

venture's view, the only indication that such a claim was allowed was a footnote in *Bermel* "stating that the rule might not apply to statutory fraud." *Id.* at 55 (citing 440 P.3d at 1154 n.6). The joint venture then identifies *McWhinney* as the tipping point in allowing it to make intentional-tort claims under the economic-loss rule. *See id.* (citing 486 P.3d at 455).

This, too, is unpersuasive. *Bermel* and *McWhinney* gave the joint venture authority for its fraud counterclaims years before it tried to plead them. *Bermel* declared that "the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation." 440 P.3d at 1154 n.6 (dictum). That declaration came five months before the joint venture's counterclaim and nearly a year before its amended counterclaim. *McWhinney* then relied on *Bermel* in concluding "that in most instances the economic loss rule will not bar intentional tort claims." 486 P.3d at 453. That conclusion came two and a half years before the joint venture sought to add its fraud counterclaims. So neither *Bermel* nor *McWhinney* shows that Colorado law "changed" at any relevant time. JV's Open. Br. at 54.

The joint venture next says it was deterred from pleading fraud because the district court "seemed to" bar claims based on pre-award conduct, on the ground that "no precontractual negotiations were occurring" at that time. *See id.* at 55.

But the ruling the joint venture says "seemed to" bar pre-award claims came years after *Bermel* and a month after *McWhinney*. *See MTD Order*, 2021

34

WL 698665, at *4. The joint venture could have alerted the district court to those cases, either before the court ruled or in a motion for reconsideration. Yet it did not do so. That was inconsistent with diligently pursuing its claims.

Finally, in a supplemental-authority letter, the joint venture points to a recent decision, *Veolia Water Technologies v. Antero Treatment LLC*, 591 P.3d 936 (Colo. 2026), that it contends "supports [its] explanation for the timing of its amendment request." JV's 28(j) Ltr. at 1. *Veolia* held that the economic-loss rule doesn't bar a fraudulent-inducement claim that arises during an earlier contract, where that contract "represents a stand-alone transaction" separate from a later contract that was fraudulently induced. *See* 591 P.3d at 938, 945.

*Veolia* doesn't change our conclusion. The issue isn't whether the economic-loss rule bars the joint venture's fraud counterclaims; the issue is whether the joint venture diligently explored and pleaded those claims under existing authority. It did not.

## B.    Prejudice

The district court didn't abuse its discretion in concluding that the new fraud counterclaims would prejudice ATS. By the time the joint venture tried to plead those claims, ATS had "spent the last four years preparing to try a five-week breach of contract case—not a fraud case—to a jury." *Modification Order*, 2023 WL 5748376, at *3 (citation omitted). So unless the court reopened discovery, ATS would have been unprepared to defend the fraud claims at trial. *See, e.g.*, *Koch*, 203 F.3d at 1223. The court ruled that the

resulting prejudice would be "substantial." *Modification Order*, 2023 WL 5748376, at *3. Given the court's "experience with and knowledge about the course of the litigation," and seeing no reason to think otherwise, we defer to this determination. *Cf. Bond v. Sheriff of Ottawa Cnty.*, 173 F.4th 1265, 1309 (10th Cir. 2026) (citation omitted).

The joint venture accuses the district court of "simply accept[ing] a rote claim of prejudice" rather than "conduct[ing] a detailed analysis." JV's Open. Br. at 56. In its view, the court should have required ATS to show what further discovery was needed, not "simply assumed that [such discovery] could not be done" before trial. *See id.*

But again, "the burden of demonstrating manifest injustice falls upon the party moving for modification." *Koch*, 203 F.3d at 1222. Put differently, "[i]t is the moving party's burden to show that a review of [the four] factors warrants a conclusion that manifest injustice would result if the pretrial order is not modified." *Byrd v. Guess*, 137 F.3d 1126, 1132 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Little v. City of Manhattan Beach*, 21 F. App'x 651, 652 (9th Cir. 2001). By arguing that ATS failed to show prejudice, the joint venture foists its own burden onto ATS.

The joint venture next argues that "[a]ny prejudice could have been cured by re-opening discovery instead of foreclosing the [joint venture's] claims entirely." JV's Open. Br. at 56. It then minimizes what further discovery was

36

needed, asserting that "[t]he basic subject-matter" of the fraud counterclaims "was the same" as that of the breach-of-contract counterclaim. *See id.* at 57.

These arguments miss the mark. Prejudice from tardy claims usually occurs when the claims "arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues." *Minter*, 451 F.3d at 1208. And despite the joint venture's efforts to downplay the problem, the showing of intent required for a fraud claim is a major issue on which ATS had taken no fact or expert discovery. *Modification Order*, 2023 WL 5748376, at *3. Besides, "the delay and expense [of] additional discovery proceedings also represent[] a form of prejudice." *Jama v. City & Cnty. of Denv.*, 304 F.R.D. 289, 301 (D. Colo. 2014). In other words, reopening discovery is not a panacea for prejudice.[11] *See id.*

## CONCLUSION

We affirm the district court's judgment for ATS on ATS's and the joint venture's breach-of-contract claims.[12]

---

[11] Even beyond the prejudice to ATS, reopening discovery "might have so severely disrupted the orderly and efficient course of [the upcoming] trial that we cannot say the district court's refusal [to do so] was an abuse of discretion." *Koch*, 203 F.3d at 1223.

[12] ATS also asks us to award it appellate fees and costs, "which ATS will present per [Local] Rule 39.2." ATS's Resp. Br. at 85. To date, ATS has not moved for such relief, so we do not consider it. *See* 10th Cir. R. 39.